PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 09-3243 & 09-3275
_____

UNITED STATES OF AMERICA

v.

WAYNE R. BRYANT,
                        Appellant (09-3243)


R. MICHAEL GALLAGHER,
                        Appellant (09-3275)



_____


On Appeal from the United States District Court
For the District of New Jersey
(D.C. Criminal Action Nos. 3-07-cr-00267-001/2)
District Judge:  Honorable Freda L. Wolfson
_____

Argued March 8, 2011
_____


Before:  SCIRICA, AMBRO,
and VANASKIE, Circuit Judges

(Opinion filed:  August 25, 2011)

Lisa A. Mathewson, Esquire (Argued)
123 South Broad Street, Suite 810
Philadelphia, PA   19109-0000

Carl D. Poplar, Esquire
1010 Kings Highway South, Building Two
Cherry Hill, NJ   08034-0000

 *Counsel for Appellant*
 *Wayne R. Bryant*

Jeremy D. Frey, Esquire (Argued)
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA   19103-0000

Ralph A. Jacobs, Esquire (Argued)
Jacobs & Singer
1515 Market Street, Suite 705
Philadelphia, PA   19102

 *Counsel for Appellant,*
 *R. Michael Gallagher*

Paul J. Fishman
 United States Attorney
Mark E. Coyne, Esquire
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102-0000

Norm Gross, Esquire (Argued)
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ  08101-0000

　　　*Counsel for Appellee*

_____

OPINION  OF  THE  COURT
_____

AMBRO, <u>Circuit Judge</u>

This case involves the federal crimes of honest services fraud, mail fraud, and bribery.  Appellants Wayne Bryant and R. Michael Gallagher were charged with six counts of honest services fraud, in violation of 18 U.S.C. §§ 1341, 1343 and 1346 (the "honest services fraud counts"), and one count each of bribery in connection with a state agency that receives federal funds, in violation of 18 U.S.C. § 666(a) (the "bribery counts"), all in connection with a scheme to defraud the citizens of the State of New Jersey of Bryant's honest services as a State Senator.  Counts 9-13 charged Bryant with mail fraud, in violation of 18 U.S.C. § 1341, in connection with a second scheme involving his state pension application.  A jury convicted Bryant on all counts and Gallagher on all counts but one, which dealt with the mailing of Bryant's 2003 Financial Disclosure statement.  Their sentences included imprisonment—48 months for Bryant and 18 months for Gallagher—and joint restitution in

3

the amount of $113,167. For the reasons that follow, we affirm their convictions and the restitution order.

## I. Background

Gallagher was formerly Dean of the School of Osteopathic Medicine ("SOM") of the University of Medicine and Dentistry of New Jersey ("UMDNJ"). Bryant, as noted, was a New Jersey State Senator. They were indicted in 2007. The charges stemmed from an alleged *quid pro quo* arrangement in which Gallagher gave Bryant a "low-show" job at SOM (meaning he provided only minimal or nominal services) as a "Program Support Coordinator," in which position he received an annual salary of $35,000 (and a $5,000 bonus), in exchange for Bryant's efforts as Chairman of the Senate Appropriations Committee to funnel State funding to SOM. The *quo* was a "success": during Bryant's tenure at SOM, the institution gained an additional $10 million in funding over three years. Based on that same scheme, Bryant and Gallagher were also charged under the federal bribery statute—Bryant for corruptly soliciting and demanding the SOM salary and Gallagher for corruptly giving the salary.

In a second scheme, involving only Bryant, the Government alleged that he also attempted to use a "no-show" job (meaning he personally provided no services at all) as an attorney for the Gloucester County Board of Social Services (the "Social Services Board") to increase his pension benefits. Specifically, the Government introduced evidence at trial showing that Bryant falsely reported that he had worked numerous hours providing legal services to the Social Services Board when he had not provided those services at all but had delegated his work to associates at his private law

4

firm. In other words, Bryant claimed pensionable time credit for work he did not do. In New Jersey, the amount of pension benefits for which a public servant is eligible depends on the number of public sector jobs held. Thus, by accumulating public sector jobs, but not actually performing the duties commensurate with the positions, the Government argued that Bryant fraudulently inflated his pension eligibility.

After Appellants' convictions in November 2008, the District Court denied their motions for a judgment of acquittal or a new trial and this appeal followed. The District Court had jurisdiction under 28 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

Appellants challenge their convictions on the following grounds: they argue that the Government violated their due process rights by interfering with their access to potential witnesses in the pretrial phase of the case; that the evidence of honest services fraud and bribery was insufficient; and that the jury instructions on both honest services fraud and bribery were defective. Bryant challenges the sufficiency of the evidence that he committed mail fraud in connection with the pension scheme. He also claims that he is entitled to a judgment of acquittal or a new trial on the pension fraud counts because the District Court improperly allowed a lay witness to testify about the law. Lastly, both Bryant and Gallagher challenge the order of restitution. We consider each argument in turn.

## II.    Discussion

## A.    The Prosecutorial Misconduct Claim

During its investigation of Appellants, the Government issued grand jury subpoenas to potential witnesses with the following language placed on the front of each subpoena:

> Disclosure of the nature and existence of this subpoena could obstruct and impede a criminal investigation into alleged violations of federal law.    Therefore, the United States Attorney requests that you do not disclose the existence of this subpoena.

Appellants argued to the District Court that this language, and the Government's requests during the grand jury proceedings that witnesses voluntarily not disclose "any matters" that occur during those proceedings,[1] interfered with the defense's access to witnesses.  They claim that this violated due process and Federal Rule of Criminal Procedure 6(e)(2)(A),[2] which

---

[1]  Appellants allege two additional examples of improper Government conduct:  that an FBI agent told a witness not to disclose the subpoena, or "words to [that] effect;" and that another agent asked a witness after her testimony whether she had heeded the nondisclosure request.

[2]  Federal Rule of Criminal Procedure 6(e)(2)(A) states, in part, that "[n]o obligation of secrecy may be imposed on any person except in accordance with [the exceptions enumerated in B]."  Those exceptions are laid out in Federal Rule of Criminal Procedure 6(e)(2)(B), which lists certain actors in the grand jury process who "must not disclose a matter

6

prohibits the Government from imposing an obligation of secrecy on witnesses. The District Court denied their pretrial motion to dismiss the indictment on those grounds. Instead, it ordered the Government to write to the witnesses and inform them that they were under no legal obligation to keep the subpoena secret.

On appeal, Appellants again argue that the Government's conduct—including both the subpoena language and its requests to witnesses to preserve the secrecy of the proceeding—violated Rule 6(e)(2)(A) and due process. They claim that the Government's actions restricted the "free choice" of potential witnesses to speak to defense counsel and effectively imposed an obligation of secrecy on those witnesses. We disagree.

We review a district court's decision regarding a motion to dismiss an indictment because of prosecutorial misconduct for abuse of discretion. *See United States v. Lee*, 612 F.3d 170, 193 (3d Cir. 2010). Generally, because witnesses "belong" neither to the defense nor to the prosecution, both must have equal access to witnesses before trial. *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir. 1981); *Callahan v. United States*, 371 F.2d 658, 660 (9th Cir. 1967). If the prosecution impermissibly interferes with the defense's access to a witness during a criminal trial, that conduct violates due process insofar as it undermines the fundamental fairness of the proceeding. *Kines*, 669 F.2d at 9 (collecting cases). In connection with a grand jury proceeding, Rule 6(e)(2) also provides that the Government may not impose an

occurring before the grand jury." Witnesses are not included in that listing.

7

obligation of secrecy on a witness absent limited exceptions, none of which applies here.

However, there is an important difference between requesting nondisclosure and discretion on the part of witnesses and artificially restricting defense counsel's access to witnesses by, for example, instructing the latter not to communicate with the former. Merely requesting that witnesses practice discretion does not violate a defendant's due process rights. *See United States v. Agostino*, 132 F.3d 1183, 1191-92 (7th Cir. 1997). Here, the record demonstrates that the Government requested, but never required, witnesses not to disclose the subpoena or the grand jury proceedings. Aside from those requests, it took no affirmative steps to restrict or stop witnesses from conferring with the defense.

Appellants argue that the language, emblazoned on the subpoena, gave an appearance of a judicial imprimatur that suggested to witnesses they were legally obligated to comply with the Government's secrecy request. Certainly, many forthright citizens would comply with such a request, given the context in which it was made. However, we will not say what occurred here imposed an obligation of secrecy. *Compare id. at* 1192 (holding that prosecutor's mere request that witness not discuss his testimony with defense counsel, while acknowledging his right to do so, did not constitute a due process violation), *with In re Grand Jury Proceedings (Appeal of Diamante)*, 814 F.2d 61, 68-70 (1st Cir. 1987) (concluding that a subpoena instructing witnesses "not to disclose the existence of this subpoena or the fact of your compliance for a period of 90 days from the date of the subpoena" impermissibly conveyed that witnesses were legally obligated to remain silent).

Nor do we think that the Government's actions infected the fairness of the proceeding. Notably, Appellants did not identify to the District Court (nor do they now) any witnesses who claim that they would have spoken to the defense but were deterred from doing so because of the Government's nondisclosure requests. Rather, those witnesses who declined to speak with the defense did so on the advice of counsel.[3] But "[n]o right of a defendant is violated when a potential witness freely chooses not to talk; a witness may of his own free will refuse to be interviewed by either the prosecution or the defense." *Kines*, 669 F.2d at 9; *see also United States ex rel. Trantino v. Hatrack*, 408 F. Supp. 476, 481 (D.N.J. 1976) ("[W]hile it is true that a witness is not to be prevented from speaking to the defense by the prosecution, it is equally true that a witness cannot be required to speak to an investigator or attorney. That matter rests . . . entirely with the witness.").

Even if there were witnesses (about whom we do not know) with the mistaken impression that they could not speak to the defense, the District Court took measures to clarify such a misunderstanding well before trial. In response to Appellants' motion to dismiss, the Court instructed the Government to send a letter to all subpoena recipients five

---

[3] These witnesses were employees of UMDNJ, whose general counsel advised them not to speak with the defense. Counsel stated that she instructed the employees not to speak with the defense for fear it would jeopardize the University's deferred prosecution agreement. In this context, we do not attribute to Government misconduct UMDNJ counsel's advice to University employees.

9

months before the start of trial, stating that the witnesses had "an absolute right to speak to anyone . . . about anything [they] know about any of the matters under investigation, including the fact that [they] were subpoenaed and . . . testified before the grand jury."[4] In particular, that letter confirmed that the Government "[would] not take any adverse action against [the witness] or [his or her] employer because [he or she chose] to speak to the defense or anyone else about these matters."

In these circumstances, we believe that Appellants have not shown that, because of the Government's conduct, there was an "absence of . . . fairness [that] fatally infected the trial." *Kines*, 669 F.2d at 9 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)); *see also United States v. Terzado-Madrugo*, 897 F.2d 1099, 1108-09 (11th Cir. 1990) (concluding that letter advising witness that she was free to talk to defense cured or mitigated any harm from Government's prior insinuation that witness would face legal consequences from speaking with defense); *Diamante*, 814 F.2d at 70 (advising the Government to correct its error of instructing subpoenaed witnesses to keep their involvement in the grand jury secret by sending out letters notifying the witnesses that they have no legal obligation to do so).[5]

---

[4] We agree with the District Court that the Government's practice of placing its non-disclosure request on all grand jury subpoenas is "not a good policy" and discourage that practice in the future.

[5] Appellants claim that, in the time before the curative letter was sent, some witnesses' memories faded before the defense could speak with them and others were too intimidated by the

Accordingly, we conclude that Appellants were not denied due process of law or the protections of Rule 6(e)(2)(A) and we decline to vacate their convictions for those reasons.[6] We now turn to the merits of Appellants' remaining claims.

## B.       Sufficiency of the Evidence on the Honest Services Fraud and Bribery Counts

After trial, Bryant and Gallagher challenged the sufficiency of the evidence to support their honest services fraud and bribery convictions in a motion for a judgment of acquittal. Fed. R. Crim. P. 29.[7] The District Court denied their motion, finding that the record supported the jury's verdict. On appeal, they again challenge the sufficiency of the evidence to support their convictions.

We review a sufficiency of the evidence challenge *de novo*, viewing the evidence in the light most favorable to the prosecution. *United States v. Miller*, 527 F.3d 54, 60 (3d Cir. 2008). Appellants have a heavy burden to carry: "[w]e will overturn a verdict only 'if no reasonable juror could accept evidence as sufficient to support the conclusion of the

---

grand jury process to come forward. They offer nothing to support these assertions and we shall not address their speculations.

[6] Nor do we believe that the District Court erred in declining to afford Appellants a hearing to demonstrate prejudice, and thus we do not remand the case for such a hearing now.

[7] Bryant also challenged the sufficiency of the evidence to support the pension fraud counts in the Rule 29 motion, which we consider below.

defendant's guilt beyond a reasonable doubt.'" *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) (quoting *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)); *see also Wright v. West*, 505 U.S. 277, 296-97 (1992) (same). We do not believe Appellants have met that burden.

Our Court has defined the elements of traditional mail fraud as follows: "To prove mail fraud, the government must establish (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails . . . in furtherance of the scheme." *United States v. Kemp*, 500 F.3d 257, 279 (3d Cir. 2007) (citation and internal quotation marks omitted). "[T]he term 'scheme or artifice to defraud' includes [one] to deprive another of the intangible right of honest services." *Id.* (citing 18 U.S.C. § 1346). Bribery, "where a [public official] was paid for a particular decision or action," is one type of honest services fraud. *Id.* (quoting *United States v. Antico*, 275 F.3d 245, 263 (3d Cir. 2001)) (alterations in original). The indictment in our case charged Appellants under a bribery theory of honest services fraud.[8]

The Supreme Court has explained that, as "[b]ribery requires intent 'to influence' an official act or 'to be influenced' in an official act . . . , there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999) (emphasis in original). As the District Court instructed the jury, a *quid pro quo* may

---

[8] They were also charged under an additional theory involving failure to disclose a conflict of interest, but the District Court struck those allegations before trial.

come in the form of a "stream of benefits." Accordingly, to prove a *quid pro quo*

> the Government is not required to present evidence that attributes each official action to a corrupt payment. It is enough for the [G]overnment to present evidence that shows *a course of conduct* of favors and gifts flowing to a public official in exchange for a *pattern of official actions* favorable to the donor. Thus, payments may be made with the intent to retain the official's services on an "as needed" basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf. The evidence of a *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the defendant] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity.

*United States v. Bryant*, No. 3:07-cr-267, 2009 WL 1559796, *4 (D.N.J. 2009) (emphases added) (citation and internal quotation marks omitted); *see United States v. Kemp*, 500 F.3d 257, 281-82 (3d Cir. 2007) (endorsing "stream of benefits" theory of honest services fraud bribery); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 n.15 (9th Cir. 2009) (same).

Appellants argue that the Government did not prove that they entered into an unlawful *quid pro quo* arrangement. They claim that, although Bryant took official action while working at SOM, the Government failed to prove that he took

13

those actions because of his employment at SOM or that the Appellants had the requisite intent to enter into an illicit *quid pro quo* agreement. However, based on the trial evidence, reasonable jurors could conclude beyond a reasonable doubt that Bryant and Gallagher had an agreement, even if implicit, that Bryant's salary, bonus, and pension eligibility would be given in exchange for his official actions to increase state funding for SOM.

The record evidence shows that in 2002 Gallagher was interested in improving SOM's political clout and that Bryant wanted a pensionable job at UMDNJ. At that time, Gallagher knew that SOM was in trouble, financially and otherwise. It was historically underfunded relative to UMDNJ's other schools, and in 2002 SOM's academic budget was reduced by 10%. Because of the budget cut and decreasing revenues in general, SOM had difficulty paying staff salaries. Also around that time the Governor appointed a commission to recommend medical education reforms. That Commission suggested the consolidation of UMDNJ with Rutgers University and the New Jersey Institute of Technology. The Government introduced evidence that Gallagher was disconcerted with this Commission report because, if such a merger occurred, he could lose his position as Dean of SOM. He expressed a desire to become more active in the "political arena" to ward off these proposed changes. For his part, Bryant was keen to get a job at UMDNJ at that time. As evidence of his interest, the Government elicited testimony from Stuart Cook, President of UMDNJ, that in 2002 Bryant approached Cook during a meeting and sought a part-time job at UMDNJ. Cook later characterized this "request" as a "shakedown" given Bryant's influence over budget decisions that affected the University.

14

Gallagher then created a new position at SOM with the title Program Support Coordinator. According to the official job description, the Program Support Coordinator would report directly to Gallagher and would work three full days a week, making him a ".6" employee. The official job description, which was approved by the Human Resources Department and posted for the public, listed the Program Support Coordinator's responsibilities as improving SOM's relations with local governments and community organizations; there was no reference to securing additional funding for SOM from the State government. The salary was approved at $35,000, which was commensurate with the work of a .6 employee.

There was evidence introduced at trial, however, that the interview process was a sham. Only two candidates were actually interviewed (including Bryant), and Bryant's interview was orchestrated only "to provide a paper trail." Robert Prodoehl, Director of Operations at SOM and later Gallagher's Chief of Staff, testified that, long before candidates were interviewed for the position, Gallagher had determined that Bryant would be hired for it. Prodoehl also testified that, notwithstanding the official job description, Gallagher told him (Prodoehl) that Bryant would only work 7.5 hours (one day) a week. This should have qualified him as only a .2 employee.

Six days after Bryant was hired, a meeting with Gallagher, Bryant, and John W. Crosbie, Director of Strategic Planning Program Development at SOM, was held to discuss how Bryant might advance SOM's "supplemental funding strategy." Henceforth, procuring additional funding appears to have been Bryant's principal activity. The Government presented evidence that, during his employment at SOM

15

(about three years), Bryant orchestrated a $2.325 million carve-out of UMDNJ's annual budget to be allocated to SOM's base funding, an $800,000 appropriation for SOM's Center for Child Support (a carve-out from the New Jersey Division of Youth and Family Services), and a $200,000 grant to SOM's Institute for Successful Aging ("ISA").[9] Notably, Bryant received a $5,000 bonus from SOM after the 2003-2004 budget passed with the $2.325 million carve-out for SOM. From this and other evidence, a reasonable jury could conclude that Gallagher offered Bryant his position at SOM in exchange for his official actions to procure additional State funding for the School and that Bryant then misused his power to that end.

Appellants' arguments to the contrary are not persuasive. They claim that Bryant would have taken many of these official actions to "serve his constituents" even without the benefits from SOM. However, the jury was not required to "find that the SOM salary was the sole impetus for Bryant's actions." *Bryant*, 2009 WL 1559796, *7 (citing *Kemp*, 500 F.3d at 281-82). Rather, "a conviction for honest services fraud may be sustained so long as there is sufficient evidence in the record for the jury to conclude that the public official intended to be influenced in exchange for a stream of corrupt payments." *Id.* Here, based on the timing of Bryant's official acts, a jury could infer that Bryant intended to accept a "stream of benefits" in the form of a salary and benefits from SOM in exchange for his official acts over the course of

---

[9] In a 2004-2005 budget program, individual New Jersey legislators could allocate discretionary grants to organizations of their choice. Bryant controlled 10% of the grants, or $4 million. This was the source of the ISA grant.

his nearly three-year employment there. That his actions may also have benefited his constituents is irrelevant.

Appellants also argue that the Government failed to prove Gallagher's *mens rea*—his intent that Bryant's salary and benefits serve as a *quid pro quo* bribe. They cite the Government's lack of a smoking gun (*i.e.*, that there was "no evidence of cash in a bag"), and assert that there is nothing wrong with Gallagher, as Dean, wanting his institution to flourish financially. The Government may prove *mens rea* with circumstantial evidence, *United States v. McKee*, 506 F.3d 225, 235 n.9 (3d Cir. 2007), and here the indirect proof of Gallagher's intent was extensive: for example, after the fraudulent job description surfaced, Gallagher made Crosbie create a false calendar to create the appearance that Bryant had done legitimate work at SOM. Gallagher also lied to his supervisors about the nature of Bryant's work, telling them that Bryant's role involved "community relations" with no mention of his funding initiatives. Based on that and other evidence discussed above, a reasonable jury could find that Gallagher had the requisite intent.

Finally, we reject Appellants' argument that the Government failed to prove the value of Bryant's legitimate services to SOM, and thus did not prove that the salary and bonus in excess of the fair value of those services was a bribe. A jury could conclude from the evidence discussed above that Bryant did not work 22.5 hours per week, as required to qualify as a .6 employee with a $35,000 salary. In any event, "[t]hat [Bryant] performed some . . . services did not prevent the jury from regarding the [salary and bonus] payments as primarily intended by [Gallagher] to secure [Bryant's] legislative help." *United States v. Urciuoli*, 613 F.3d 11, 14 (1st Cir. 2010) *cert. denied*, 131 S. Ct. 612 (2010) (addressing

17

argument that state senator provided some legitimate services in exchange for job at medical center in the context of honest services fraud conviction under a bribery theory).[10]  In sum, the evidence allowed a jury to conclude that Bryant's salary and benefits—nominally for his public relations work—were in fact provided in exchange for his abuse of office.

Because we believe that the Government presented substantial evidence of a *quid pro quo* bribery scheme to defraud the citizens of New Jersey of Bryant's honest services, including circumstantial evidence of the requisite *mens rea*, we affirm the convictions on the honest services fraud and bribery counts.[11]

**C.    Jury Instructions on the Honest Services Fraud and Bribery Counts**

**1.    Honest Services Fraud Jury Instructions**

---

[10] Appellants cite evidence they submitted at trial, purporting to show that Bryant provided legitimate services to SOM. They "[were] free to make such arguments to the jury, but the jury could fairly reject them."  *Urciuoli*, 613 F.3d at 15.  We presume the jury did so, as we review the evidence in the light most favorable to the Government.  *Miller*, 527 F.3d at 60.

[11] Inasmuch as we believe the evidence was sufficient with respect to the *quid pro quo* alleged in the honest services fraud counts, we also conclude it was sufficient to support the bribery counts, as the bribery counts were based on the bribery alleged in the honest services fraud counts.

Appellants argue that the jury instructions for the honest services fraud counts were incorrect in light of the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), which limited the scope of honest services fraud to its historic "core." Specifically, the *Skilling* Court defined the "core" of honest services fraud to include only the types of bribery and kickback schemes that were criminalized in cases prior to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987).[12] Appellants allege that the honest services fraud instructions were deficient because they did not require the jury to find an intent to "alter" an official action. They contend further that the instructions' use of the stream-of-benefits theory and dual purpose test (both discussed below) were legally incorrect after *Skilling*, as they claim both are outside the honest services fraud "core." We are not persuaded that *Skilling* had that effect on the law of honest services fraud, nor do we believe that the instructions failed to state the proper intent requirement.

We review *de novo* whether a jury instruction stated the proper legal standard. *United States v. Flores*, 454 F.3d 149, 156 (3d Cir. 2010). The Court instructed the jury on the honest services fraud counts as follows:

> Counts 1 through 6 charge the defendants with committing honest services fraud by means of a *quid pro quo* bribery scheme. Bribery requires a *quid pro quo*, that is, a specific intent to give

---

[12] *McNally* had struck down the notion of honest services fraud by limiting mail fraud to schemes involving tangible property rights, which, in turn, prompted Congress to enact 18 U.S.C. § 1346, overruling *McNally*.

or receive something of value in exchange for one or more official acts.

In order to find that a defendant engaged in *quid pro quo* bribery, you must find that the government proved each of the following beyond a reasonable doubt with respect to that defendant:

First: that R. Michael Gallagher gave, offered or promised something of value, particularly a stream of payments in the form of a salary and other financial benefits to Wayne Bryant;

Second: that Wayne Bryant was, at that time, a public official;

Third: that with respect to R. Michael Gallagher, he intended to give the stream of payments in the form of salary and other financial benefits in exchange for one or more official acts.

That with respect to Wayne Bryant, he intended to perform one or more official acts in exchange for his salary and other financial benefits from [SOM.]

A *quid pro quo* agreement may be implicit as well as explicit. The improper benefit may consist of money and other financial benefits whether given on a one time basis or as a stream of payments to the public official. In other words, when payments are accepted by a public

official from a payor with the intent to obtain that official's actions on an "as needed" basis, so that when the opportunity presents itself that public official takes specific official action on the payor's behalf in return for those payments, that constitutes a breach of the public official's duty of honest service.

You may find that the payor and/or the recipient has engaged in bribery even though the recipient could have lawfully engaged in the official conduct in question.

Appellants' first challenge to these instructions is that it did not require the jury to find that the payor (Gallagher) intended to "alter" the conduct of the public official (Bryant). They argue that the instruction suggested to the jury that honest services fraud included accepting payments for something a public official was already planning to do or had already done, which is a gratuity (or "reward") and not a bribe, and thus not within the "core" of honest services.[13] In short, they contend that the instructions did not make clear the specific exchange—that is, that Gallagher had to intend to influence Bryant's actions and that Bryant had to intend to be influenced by the SOM salary and benefits.

Appellants are correct that "bribery requires a *quid pro quo*, which includes an intent to influence an official act

---

[13] In *Kemp* we stated that a gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." 500 F.3d at 281 (quoting *Sun-Diamond*, 526 U.S. at 405).

21

or to be influenced by an official act." *Kemp*, 500 F.3d at 281 (construing federal bribery and gratuity statute, 18 U.S.C. § 201, which is "equally applicable to bribery in the honest services fraud context") (citations and internal quotation marks omitted). It is also true that "bribery requires a specific intent to give or receive something of value in exchange for an official act." *Id.* (emphasis omitted). But they are incorrect that the instruction failed to state clearly those legal requirements.

Yet Appellants ignore a key passage of the Court's instructions, which stated:

> [N]ot every payment made to a public official constitutes a bribe. A payment made in a general attempt to build goodwill or curry favor with a public official, without more, does not constitute a bribe. . . . What distinguishes a bribe from other payments that would not constitute violations is that a bribe is *offered or accepted with the intent to influence, or to be influenced, in an official act*.

(emphasis added). This instruction made clear that an intent to influence was required for a finding of guilt.[14] Despite Appellants' suggestion otherwise, the Supreme Court has never required proof that the recipient actually perform the official act for which the bribe was taken (the *quo*). *See United States v. Brewster*, 408 U.S. 501, 527 (1972); *United*

---

[14] Appellants concede in their Reply Brief, and we agree, that there is no meaningful difference between an intent to "alter," and an intent to "influence," official acts.

*States v. Hood*, 343 U.S. 148, 151 (1952). Nothing in *Skilling* overrules this existing law.

Next, Appellants challenge the stream-of-benefits theory: that a bribe may be given in the form of a series of benefits in exchange for official action on an "as needed" basis. Appellants suggest that this theory is indistinguishable from the conflict-of-interest theory of honest services fraud, which was rejected in *Skilling* as outside the core of honest services fraud.[15]

Nothing in *Skilling*, however, undermines the viability of the stream-of-benefits theory, which this Court first endorsed in *Kemp*, 500 F.3d 257. *See United States v. Whitfield*, 590 F.3d 325, 352-53 (5th Cir. 2009); *United States v. Ganim*, 510 F.3d 134, 144-47 (2d Cir. 2007); *Urciuoli*, 613 F.3d at 13-14 (confirming stream-of-benefits theory survived *Skilling*). Indeed, *Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery, but simply eliminated honest services fraud theories that go beyond bribery and kickbacks. Appellants' reliance on *Skilling* to undercut the stream-of-benefits theory is thus misplaced.

Finally, Appellants take issue with the dual purpose aspect of the jury instructions, that is, that the instructions

---

[15] The conflict-of-interest theory of honest services fraud criminalized undisclosed self-dealing by public officials whose actions furthered their own financial interests while purporting to act on behalf of the public. *Skilling*, 130 S. Ct. at 2932 (citation omitted). As noted, *see supra* note 8, the District Court in our case struck the charges that relied on a conflict-of-interest theory before trial began.

23

allowed for conviction on the honest services fraud counts even if the jury believed Gallagher was partially motivated to pay Bryant for some legitimate work as well as his official action. Specifically, they object to the following portion of the instructions:

> You may find that any salary and other financial benefits accepted by Wayne Bryant was a bribe even if you also find it was paid, in part, for legitimate work if it was also paid, in part, in return for Wayne Bryant's official action.

The Appellants insinuate that this dual purpose test is similarly outside the core of honest services fraud. *Skilling* did not so hold and we do not adopt that interpretation, as the consequences would be untenable. On Appellants' interpretation, a payor could bribe an official with impunity, intending to influence official action and vice versa, provided that the payor had some additional hope, however small, of receiving legitimate work in return. We shall not stretch *Skilling* in this way.

### 2.       Section 666 Bribery Jury Instructions

Appellants' challenge to the bribery instruction is similarly strained. They claim that these instructions were defective because they did not require an "exchange," but merely a convergence in time of the *quid* and the *quo*. To convict, the instructions required the jury to find as follows:

> [W]ith respect to Wayne Bryant, that Wayne Bryant corruptly accepted, agreed to accept, solicited, or demanded salary payments and other financial benefits from UMDNJ/SOM, the

24

quid; *while intending to be influenced* in taking favorable actions toward SOM in his capacity as a state legislator, the quo.

With respect to R. Michael Gallagher, that R. Michael Gallagher corruptly gave, agreed to give, or offered salary payments and other financial benefits from UMDNJ/SOM, the quid; *while intending to influence* Wayne Bryant in taking favorable actions toward SOM in his capacity as a state legislator, the quo.

(Emphases added.)  Appellants parse the language of these instructions to claim that the word "while" might have led the jury to believe that the Appellants were guilty so long as Gallagher intended to influence Bryant's official actions "at the same time" as he was receiving his SOM salary and benefits, without having to conclude that the salary and benefits were provided "in exchange for" his official action.

Once more we fail to see the lack of an exchange requirement in these instructions.[16]  We do not think the word "while" materially changes the "intending to influence" language in the instructions.  Tracking closely to the language of the bribery statute,[17] the "intending to influence" and

---

[16] The Government argues that § 666 does not require proof of a *quid pro quo* in any event.  Because we believe that the instruction did require the jury to find an exchange, we need not decide that question today.

[17] Bribery occurs when a public official "corruptly solicits or demands . . ., or accepts or agrees to accept, anything of value from any person, *intending to be influenced* or rewarded in

"intending to be influenced" phrases effectively link the *quid* and the *quo*. This construction is not ambiguous (an identified *quid* must be given, with the intent of influence, in return for a *quo*) simply because the word "while" is used. Moreover, the Court's prior instruction on the honest services fraud counts made clear that the jury had to find an exchange in order to find that there was a *quid pro quo*.[18] The jury was told to refer back to those earlier instructions for consistency and to consider all of the "instructions as a whole." In the final charge, the Court explained to the jury that "each part or phase of these instructions is to be considered and applied together with all the other parts and phases of the instructions." We assume that the jury followed their

---

connection with any business, transaction, or series of transactions of such organization, government, or agency . . . ." 18 U.S.C. § 666(a)(1)(B) (emphasis added).

[18] The instruction provided:

> In order to find that a defendant engaged in quid pro quo bribery, you must find that the government proved [that Gallagher] intended to give the stream of payments in the form of salary and other financial benefits *in exchange for* one or more official acts [and that ] Bryant . . . intended to perform one or more official acts *in exchange for* his salary and other financial benefits from [SOM].

(Emphases added.)

instructions.[19] *United States v. Lee*, 573 F.3d 155, 162 (3d Cir. 2009).

\* \* \* \* \*

Because we believe there was no defect in either the jury instruction for honest services fraud or bribery, we do not reverse Appellants' convictions on that ground.

**D.     Bryant's Pension Fraud Counts**

Bryant was charged and convicted of mail fraud in connection with a scheme to defraud the New Jersey Division of Pensions and Benefits ("the Pension Division") by fraudulently seeking pension payments for his low-show job at SOM and his no-show job at the Social Services Board. He argues that he should be acquitted of his conviction on those counts or, in the alternative, afforded a new trial because the evidence was insufficient and because the District Court abused its discretion in allowing a lay witness, Frederick Beaver, to testify about a legal issue.

**1.     The Sufficiency of the Evidence on Pension Fraud**

As discussed above, we believe that substantial evidence supported the honest services fraud bribery

---

[19] For that reason, we also reject Appellants' speculation that the jurors turned to the indictment, which lacked language of "exchange" in the § 666 charges, for clarification, as the Court instructed that they were only permitted to apply the law provided to them by the Court and that the indictment was an accusation and nothing more.

conviction in connection with Bryant's SOM job; thus, we do not repeat that analysis here. Accordingly, the only question remaining is whether the evidence taken in the light most favorable to the Government shows that Bryant fraudulently sought pension benefits for the services, if any, he rendered to the Social Services Board.[20] We believe that it does.

As noted, the Government's theory on the pension fraud counts was that Bryant submitted a fraudulent application for pension benefits—that is, he claimed himself eligible for benefits to which he knew he was not entitled from two public sector jobs (at SOM and the Social Services Board). In New Jersey, the amount of a person's pension is

_____

[20] In its ruling on Appellants' Rule 29 motion, the District Court noted "whether Bryant's employment at SOM was unlawful does not necessarily satisfy the present inquiry [of whether the evidence is sufficient to support the pension fraud counts]. Whether or not the Division would have ultimately denied Bryant his pension *if it knew* the facts alleged in the Indictment is beside the point if Bryant took actions to make sure the Division would not know those facts." *Bryant*, 2009 WL 1559796, *14 (quoting *Bryant*, 556 F. Supp. 2d at 434) (citation and internal quotation marks omitted) (emphasis in original). "Rather, the jury could find that Bryant willfully engaged in mail fraud if the evidence demonstrated that Bryant concealed the nature of his actual employment at SOM and [the Social Services Board], *i.e.* his duties and the time he spent working on matters for SOM and [the Social Services Board]." *Id.* For the reasons stated above, we believe that a reasonable jury could find that Bryant concealed the nature of his employment at SOM as part of its overarching conclusion that the job was a bribe.

28

determined by a three-year average of his highest salaries across all of his qualifying, meaning public sector, jobs. This is known as the "high three." At the time of Bryant's application, he had accumulated pension-eligible salaries from four positions: as a State Senator, as a Program Support Coordinator at SOM, as a staff attorney for the Social Services Board, and as a lecturer at Rutgers University. Assuming pension credit from those jobs, Bryant selected a pension plan option that put his annual benefits at $81,268. However, without the SOM and the Social Services Board jobs qualifying, his benefits range would have been between $31,000 and $37,000. Thus, the Government claimed at trial that because Bryant did little or no work at either SOM (because the job was a bribe) or the Social Services Board (because he never showed up to do the work himself), his pension application fraudulently inflated his eligibility for benefits.

The elements of traditional mail fraud, in which money or property is the object of the fraud, are: (1) a scheme or artifice to defraud by means of a materially false or fraudulent pretense; (2) participation by the defendant with specific intent to defraud; and (3) use of the mail in furtherance of the scheme. *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (internal quotation marks omitted). Bryant argues that the Government failed to prove the first two elements.

Bryant first claims that the Government did not prove that he made any false statements in his pension application. The evidence is otherwise. In May 1996, Bryant was hired by the Social Services Board, a public and social services and welfare agency, as a part-time associate counsel and enrolled for pension benefits with the New Jersey Public Employee Retirement System ("PERS"). He was hired as an individual,

salaried employee, which status made him eligible for those benefits. His responsibilities included "attendance in court [and] representation of [children] in board, support matters, paternity establishments and related duties." However, shortly after Bryant began his employment at the Social Services Board, his supervisors began receiving complaints that he was not personally appearing in court on behalf of the agency, as he was sending other lawyers from his private law firm, Zeller and Bryant, to perform his work. On initial discovery of Bryant's delegation, his supervisor reminded him that he was required personally to perform the attorney work that he was hired to do. Nevertheless, Bryant continued this practice for several years (from 2002-2006) and ultimately did little, if any, work for the Social Services Board. Because neither Social Services Board members nor other agency supervisors attended the various court appearances, Bryant's continued delegation of duties was not discovered. Bryant did not train or supervise those to whom he delegated his work, but assigned even that oversight role to one of his law firm partners.

During this time, Bryant misrepresented to the Social Services Board that he was personally performing his work. The agency required all employees to submit written time sheets, on which the employee had to "[f]ill in the hours actually worked in each unit." Bryant claimed credit for the work he delegated: on some he claimed as many as 22 hours every two weeks, and on many others he claimed over ten hours. By signing those timesheets, he "submit[ed] that the above entries represent[ed] the hours [he] worked in the listed work units and the other compensable hours [he] used during th[ose] pay period[s]." Bryant's time records at his law firm belied those representations: they showed that he worked no

30

hours for the Social Services Board in 2002, 10.3 hours in 2003, 4.5 hours in 2004, and not at all in 2005 and 2006.

In order to reap the benefit of this scheme, Bryant communicated with the Director of the Pension Division, Frederick Beaver, in January 2006 to determine the range of pension benefits for which he (Bryant) would be eligible on retirement. In December 2006, he submitted his application for retirement benefits with plans to retire the next month.

On those facts, we believe that Bryant's application for pension benefits was a materially false or fraudulent pretense under § 1341. We reject the legalistic argument that his application was not a false statement *per se*, but simply a request for benefits. As we have said, "fraudulent representations, as the term is used in [section] 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments." *United States v. Olatunji*, 872 F.2d 1161, 1667 (3d Cir. 1989) (citations omitted). For that reason, we believe that the presentation of a benefits application that misrepresents an applicant's eligibility is a false pretense that can serve as the basis of mail fraud liability. Here, Bryant's "request" for benefits concealed that he had delegated most of his work at the Social Service Board. As such, we believe the application was a false pretense that was key to his scheme to defraud the Pension Division.

Bryant next asserts that the Government did not prove his intent to defraud because he did not know that claiming benefits to which he was not entitled was illegal. He claims a lack of notice because (1) there were no statutes or regulations that prohibited attorneys from claiming credit for

31

work that they had delegated, and (2) because the Pension Division was "well aware" of other lawyers who had done this and never attempted to revoke a pension for that reason prior to 2007 (when this case began).

Neither claim is tenable. There was no evidence at trial that it was commonplace for the Social Services Board attorneys who were enrolled in PERS to delegate work duties, or that the agency had *de facto* accepted such practices. The Division Director (Beaver) testified that he was aware of only a few attorneys who had done so and that he had tried to put an end to it by reporting them to the Pension Board. In addition, Beaver testified that prior to 2007 there was no specific statutory or regulatory prohibition against delegating work because "there was a presumption" by pension administrators "that the [employee] is doing the work." In sum, the unrebutted evidence showed that Bryant lied by claiming he was personally performing hours of work that he had delegated to others. This behavior created an inference that he intended to defraud the Social Services Board in part so that he would be eligible for higher pension benefits. *See United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (citing *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997)) (intent to defraud may be inferred from evidence that defendant attempted to conceal activity).

Finally, Bryant argues that there is a "convergence" problem with the evidence: that is, that the party to whom the fraudulent pretenses were made (the Social Services Board) was not the same as the party from whom money or property would have been taken (the New Jersey pension system). We have yet to decide this issue in the context of mail fraud. *Compare United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) ("Turning to whether we should now adopt a

convergence theory, we see little reason to do so. Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived . . . . We see no reason to read into the statute an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud."), *with United States v. Keane*, 678 F. Supp. 708, 711 (N.D. Ill. 1987), *aff'd*, 852 F.2d 199 (7th Cir. 1998) ("to constitute fraud, the entity to be deceived must *also* be the entity that is to part with property") (emphasis in original).

However, we need not make that decision now, for Bryant's fraud was not entirely "derivative" of the fraud on his employer, the Social Services Board, as he argues. As we said above, his pension application was itself a materially false pretense, made to the Pension Division, that was part of his scheme to defraud the pension system. *Cf. Olatunji*, 872 F.2d at 1168 (concluding that an indictment may properly allege mail fraud where false statements are made to two different Government agencies even though the scheme is alleged to deprive property from only one, the "ultimate victim"). Accordingly, we conclude that Bryant has not carried his heavy burden of prevailing on his insufficient evidence claim and affirm his convictions on the pension fraud counts.

### 2.     The Beaver Testimony

As discussed, the main issue at trial on the pension fraud counts was whether Bryant defrauded the Pension Division by claiming benefits to which he was not entitled. That issue turned in part on whether the work Bryant did for the Social Services Board qualified as a "creditable service" under New Jersey statute and regulation. Only if Bryant's

33

work was creditable service would he be eligible for pension benefits from the job. This was related to the Government's burden of showing that Bryant's misstatements on his pension application were "material." To prove this, the Government wanted to show that Bryant's representations that he had done the work himself were material to the Pension Division's benefits-eligibility determination because in doing so he had effectively represented that his services were creditable. To that end, the Government proposed testimony from the Director of the Pension Division, Beaver.[21] He was to testify from his personal knowledge and experience at the Pension Division about, among other things, what is considered creditable service.

The defense objected to the proposed testimony on the ground that testimony about creditable services was expert testimony on the law and Beaver was not such an expert. After a hearing on the admissibility of the proposed testimony, the Court allowed it limited to the issue of

---

[21] Prior to trial, the District Court asked the Government to offer information about the "areas that would be explored with Mr. Beaver" so that it could decide whether his testimony would be lay or expert. Prior to that, the Government had provided a letter disclosure to the defense stating that Beaver would testify "based on his personal experience and his knowledge of the state pension rules and practices derived from that experience." The Government anticipated that Beaver would testify, among other things, about "what constitutes honorable service and creditable service, circumstances under which an enrollee may not be entitled to benefits, [and] what information is important in granting and administering benefits."

34

materiality: whether it is material to the Pension Division's benefits-eligibility determination that a person does not personally perform his work but rather delegates that work to others in his law firm.

Pursuant to that limitation, Beaver testified at trial that, based on his experience, repeatedly delegating work to others would not qualify as creditable service. He stated that, for a service to be creditable, the person had to personally perform the work. At certain points, however, Beaver spoke to the criteria for creditable service in reference to "statutory cite[s]" or "the statutory requirements of the administrative code." In one instance, he stated that, given certain statutory requirements, "we [the Pension Division] would look to creditable service [as] being any service that was delivered on behalf of the employer." At other times in the testimony, the Government asked Beaver whether he was familiar with various statutes and legal decisions.

The defense objected that Beaver had offered improper legal testimony that exceeded the scope of what the Court had approved before trial, and moved for a mistrial. The District Court denied the motion. Later, two days before the jury was charged, the defense requested a limiting instruction regarding Beaver's testimony. The Court agreed and instructed the jury as follows:

> [Y]ou may only consider Frederick Beaver's testimony as expressing his view and based on his experience as Director of the New Jersey Division of Pensions and Benefits . . . .

> Mr. Beaver is not an expert witness and may not opine on legal issues. You must disregard any

> of his testimony that touched on his interpretation of any legal issue[,] including the legal definition of creditable service.
>
> Mr. Beaver's testimony regarding the importance of PERS members personally performing work was admitted for the limited purpose of showing materiality. . . .

Bryant now argues that the District Court abused its discretion in allowing Beaver's testimony in the first place and that the limiting instruction was insufficient to cure the prejudice of that improper testimony. He asks us to order a judgment of acquittal or, in the alterative, a new trial.

A district court's ruling admitting witness testimony is reviewed for abuse of discretion. *United States v. Stadtmauer*, 620 F.3d 238, 260 (3d Cir. 2010). The Government's stated objective in offering Beaver's testimony was to unravel for the jury whether Bryant's false statements that he had personally performed his work were material to his benefits eligibility. As a principal decisionmaker at the Pension Division, Beaver's testimony on this point was important. Indeed, at trial Bryant claimed that his misrepresentations were not material because the Social Services Board knew that some employees delegated their work and, by not stopping the practice sooner, had effectively condoned it. Given the important and contested nature of this issue, we do not think that the District Court abused its discretion in allowing Beaver to testify about it as a fact witness. To the extent that Beaver then testified on the law of creditable services (and not just on materiality), we believe that the Court's limiting instruction was sufficient to cure any prejudice.

36

Moreover, Bryant did not object to the limiting instruction at trial, and so we review it for plain error. *United States v. Ozcelik*, 527 F.3d 88, 96 (3d Cir. 2008); *see also United States v. Marcus*, 130 S. Ct. 2159, 2162 (2010) (establishing plain error requires showing of "error"; that is "clear or obvious"; that "affect[s] the appellant's substantial rights" insofar as it "affect[s] the outcome of the district court proceedings; and "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings").

Bryant first contends that the instruction was given too late—26 days after Beaver's testimony and two days before the final charge of instructions to the jury. However, Bryant is in no position to complain about the timing of this instruction, as he did not request one until that time and the Court promptly complied. In any event, we think that two days before the final charge is a reasonable time for a trial court to issue a limiting instruction to the jury. In this context, Bryant has not shown that the District Court committed an error, let alone a plain one.

The remainder of Bryant's complaints boil down to an argument that the jurors did not understand the instruction. He argues that they could not have understood the difference between materiality and "a legal issue" and that the distinction between the two is illusory in any event.

Again, as noted, we generally presume that juries follow their instructions. *Lee*, 573 F.3d at 162; *see also United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (same). This includes an instruction to disregard certain evidence, "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be

37

devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citation and internal quotation marks omitted) (motion to strike).

In our case, the Court instructed the jury not to consider Beaver's testimony to resolve any legal questions, but only for the purpose of deciding whether Bryant's misrepresentations were material. It then instructed on the definitions of materiality (the objective question on which the jury could consider Beaver's testimony) and creditable service (the legal question on which the jury could consider only the Court's charge). At no time did the jury express confusion or ask for clarification on the difference between materiality and creditable service. It is of no consequence that the Court gave the limiting instruction before it defined materiality and creditable service, as it had directed the jury at the outset of trial not to begin deliberations until it received *all* instructions on the law. *See United States v. Diaz*, 597 F.3d 56, 62-63 (1st Cir. 2010).

With this backdrop, we do not believe that the jury failed to understand the limited purposes for which it could consider Beaver's testimony.[22] Because we believe the

---

[22] We note that Bryant overstates the importance of the legal question of whether he provided *bona fide* creditable service to the Social Services Board. Lying about personally performing the work is what got him into trouble, not the fact that he had not actually rendered creditable service. As the District Court instructed, "the question before [the jury] is not whether the [Pension Division] would have approved Wayne Bryant's application for pension benefits. [The jury is] to decide only whether the government has proven beyond a reasonable doubt that Wayne Bryant intended to defraud the

testimony was properly admitted in the first instance and that there was no error (and, in any event, no clear error) in the limiting instruction, we deny Bryant's request for a judgment of acquittal or a new trial.[23]

## E.     The Restitution Order

At sentencing, the Court ordered Appellants to repay the full amount of Bryant's SOM salary and bonus ($113,167) as restitution to UMDNJ pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. Appellants argue that this order should be reversed because the UMDNJ was not a victim within the meaning of the statute and, therefore, an award of restitution is not proper under the MVRA. They contend further that, even if it were,

---

[Pension Division] of money and property by the use of the mails." Put another way, whether delegating work to others nonetheless could have qualified as creditable service is not what mattered at trial; what mattered for purposes of a mail fraud conviction was whether Bryant lied on his application by claiming he had done the work himself because that false pretense evidenced his intent to defraud the Pension Division.

[23] Bryant also argues that Beaver's testimony was the only evidence that he submitted a false or fraudulent benefits application. However, Beaver's testimony about what factors are material to the Pension Division's decisions regarding benefits eligibility is unrelated to whether Bryant submitted a fraudulent application. Moreover, for the reasons stated above, there was ample other evidence that he did so. As we conclude that the District Court did not abuse its discretion in admitting the testimony and that the curative instruction was not plainly erroneous, this argument fails.

the Court failed to offset the order by the fair value of the services Bryant provided to SOM. Because we believe that UMDNJ is a proper victim under the statute, we conclude that restitution to that entity was appropriate. Moreover, because Appellants did not carry their burden of proving the value of any offsets that might have been warranted, we also affirm the amount of restitution ordered.

We review *de novo* whether restitution is permitted by law and the amount of the award for abuse of discretion. *United States v. Quillen*, 335 F.3d 219, 221-22 (3d Cir. 2003) (quoting *United States v. Simmonds*, 235 F.3d 826, 829 (3d Cir. 2000)). The MVRA defines a victim as "a person" harmed

> as a result of the commission of an offense for which restitution may be ordered . . .[,] including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). Noting the MVRA's "expansive purpose," other courts have interpreted "person" to include governmental entities, *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004) (U.S. Government); *see also United States v. Lincoln*, 277 F.3d 1112, 114 (9th Cir. 2002) (same). Consistent with that purpose, we believe that the MVRA definition of victim includes public institutions that receive government funding, such as UMDNJ.

Appellants argue, however, that the "medical school" cannot be a victim within the meaning of the MVRA because

it knowingly participated in the scheme to hire Bryant in exchange for his official action and, in fact, benefitted financially from this scheme. They claim that, because the school gained money from the scheme, the order of restitution does not compensate a victim for "actual losses" as required by the statute, but rather imposes a disgorgement penalty on Appellants consistent with a theory of unjust enrichment but not the MVRA.

Appellants blur the difference between UMDNJ and SOM by referring to "the medical school" generally. Contrary to their characterization, the indictment did not allege a scheme designed to benefit "the medical school," but rather one to benefit SOM and its programs. Specifically, the Government proved that the scheme carved out $2.325 million from the UMDNJ budget for direct allocation to SOM. In his position as Chairman of the Senate Budget Committee, Bryant insisted that this carve-out of UMDNJ's annual allocation be added to SOM's base funding and be similarly allocated in each subsequent year. Never before had SOM received such a carve-out, and no evidence indicated that Bryant had ever advocated for SOM within the Budget Committee before going on SOM's payroll. Thus, UMDNJ suffered financially at the expense of the *quid pro quo* exchange.

We are not persuaded by Appellants' claims that UMDNJ was not a victim because high-level employees at UMDNJ were knowing participants in the scheme. Those assertions are contrary to evidence presented at trial and credited by the District Court at sentencing: in particular, that Gallagher kept his superiors at UMDNJ ignorant about his agreement with Bryant and never told anyone at UMDNJ that Bryant was not performing the work he was supposed to be

doing or that he was exercising his official power in favor of the institution. We see no reason to disturb these conclusions, and thus reject that UMDNJ was in league with Bryant and Gallagher such that it was not a proper victim; it was a victim who suffered actual losses.

We also reject Appellants' assertions that charging honest services fraud, which is fraud that results in a loss to the public of its right to the honest services of its public servants, is inconsistent with a theory of financial loss to a victim. We fail to see how the intangible losses associated with honest services fraud preclude the possibility of actual financial losses to an identifiable victim as well. Here, as noted above, the New Jersey public was deprived of Bryant's honest services and UMDNJ was deprived of $2.325 million in funding. The MVRA provides a remedy for the latter loss. Moreover, restoring the financial loss to UMDNJ also indirectly compensates the public for its loss of Bryant's honest services. UMDNJ, as a recipient of taxpayer funds, is a proxy for the State's interests, including its citizens' interest in the honest services of its public servants. *See United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) (ordering restitution to nonprofit organization by state senator who traded kickbacks for state contracts where the organization was a proper "proxy" for the victim, the United States and the federal interest in general). Thus, we conclude that the order of restitution was lawful, and now consider Appellants' challenge to the amount of the award.

The MVRA requires restitution be ordered for the "full amount" of each victim's loss. 18 U.S.C. § 3663(f)(1)(A). "The proper amount of restitution is the amount wrongfully taken by the defendant." *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998) (citing 18 U.S.C.

42

§ 3663A(b)(1)(B)).  As noted, Appellants argue that the District Court should have offset the restitution amount (the sum total of Bryant's salary and bonuses from SOM) by the value of the legitimate services Bryant provided, as he was charged as having a low-show, not a no-show, job at SOM.

Under the MVRA, the Government has the burden of proving the amount of the victim's loss, but the defendant has "[t]he burden of demonstrating such other matters as the court deems appropriate," 18 U.S.C. § 3664(e).  In other cases where offsets are claimed, such as for compensation that the victim gets from other sources, other Courts of Appeals have concluded that it is the defendant's burden to prove those offsets.  *See United States v. Elson*, 577 F.3d 713, 734 (6th Cir. 2009); *United States v. Calbat*, 266 F.3d 358, 365 (5th Cir. 2001)  Likewise, with respect to an offset for services rendered, we believe that, because "[t]he restitution statute allocates the various burdens of proof among the parties who are best able to satisfy those burdens[,] . . .  the defendant should know the value of any [legitimate services] he has already provided to the victim[, and so] . . . the burden should fall on him to argue for a reduction in his restitution order." *Elson*, 577 F.3d at 734 (citation and internal quotation marks omitted).  Because it was Appellants' burden to prove offsets for any legitimate services Bryant might have rendered, and they failed to do so at sentencing, we conclude that the District Court did not abuse its discretion in ordering $113,167 in restitution.[24]

---

[24] We note that in other circumstances the proper loss calculation may not equal the full amount of a corrupt employee's salary and bonus, particularly in cases where the employer would have hired an "honest" public servant and

43

## III. Conclusion

We believe sufficient evidence supported each of the counts of conviction. Moreover, we discern no defect in the jury instructions for honest services fraud or bribery. We conclude also that the District Court did not abuse its discretion in regard to the Beaver testimony involving Bryant's pension fraud counts. Finally, we hold that the Court's restitution order was proper. We thus affirm in all respects.

---

paid him or her the same amount. In those cases, the loss may be "the difference in the value of the services that [the corrupt employee rendered] and the value of the services that an honest [employee] would have rendered." *United States v. Sapoznik*, 161 F.3d 1510 (10th Cir. 1995). Here, however, the job at SOM was created to accommodate Bryant—a false job description was drafted and the subsequent hiring process was a sham predestined to result in hiring Bryant for the position. Presumably, absent the *quid pro quo*, the position would not have been made and filled, and thus in this case the full amount of the salary and bonus is appropriately "pegged to the *actual* losses suffered by the victims of the defendant's criminal conduct," and "based upon *losses directly resulting* from such conduct." *Quillen*, 335 F.3d at 222 (emphases in original).