# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Universal Public Transportation, Inc., 2012 IL App (1st) 073303-B**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. UNIVERSAL PUBLIC TRANSPORTATION, INC., Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-07-3303 |
| Filed | May 23, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the prosecution of defendant corporation for the fraudulent billing of the State of Illinois for transporting public aid recipients to medical appointments, the State proved that the corporation's *de facto* officers committed vendor fraud, theft and money laundering and the evidence supported the corporation's convictions for those crimes, the corporation's convictions did not conflict with the acquittal of the nominal owner of the corporation for the same charges, and the admission of certain exhibits as business records was not an abuse of discretion; however, the restitution order was reversed and the cause was remanded to establish an appropriate amount for restitution, since the trial court failed to consider the value of the services defendant rendered in ordering restitution. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-2262; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

| Counsel on Appeal | Delgado, Adam, Robertson & Tiernan, P.C., of Chicago (Robert Robertson, of counsel), for appellant. |
|---|---|
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Karl R. Triebel, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion. Justices Salone and Sterba concurred in the judgment and opinion. |

# OPINION

¶ 1 Our supreme court directed us to vacate the judgment we filed in this case on March 31, 2010, and to reconsider the case in light of *People v. Gutman*, 2011 IL 110338. We now vacate the earlier judgment and substitute this opinion in its place. *People v. Universal Public Transportation, Inc.*, 401 Ill. App. 3d 179 (2010), *appeal denied*, No. 110326 (Jan. 25, 2012).

¶ 2 Following a bench trial, the trial court found the defendant, Universal Public Transportation, Inc. (UPT), guilty of vendor fraud (305 ILCS 5/8A-3 (West 2000)), theft (720 ILCS 5/16-1 (West 2000)), and money laundering (720 ILCS 5/29B-1 (West 2000)). The court sentenced UPT to one-year conditional discharge and ordered it to pay $2,966,187.38 in restitution and $200,000 in fines. On appeal, UPT presents the following issues for our review: (1) whether the State proved UPT guilty beyond a reasonable doubt of vendor fraud, theft and money laundering; (2) whether UPT's convictions were legally inconsistent with the acquittal of UPT's owner on the same charges; (3) whether the trial court erred in admitting financial records from the Illinois Department of Public Aid (Department) as business records; and (4) whether the trial court erred in ordering UPT to pay in restitution the total amount the State paid to UPT, without any offset for the value of the services that UPT provided to the State.

¶ 3 On the initial appeal, we affirmed the convictions for vendor fraud and theft, but we reversed the conviction for money laundering and remanded for reconsideration of the sentence, including restitution. Our supreme court, in *Gutman*, rejected the interpretation of the money laundering statute that we relied on in our earlier decision in this case. Upon reconsideration in light of *Gutman*, we find that the State proved UPT's *de facto* officers committed vendor fraud, theft and money laundering in the course of their work on behalf of UPT, and therefore the evidence supports the convictions of UPT for all three crimes. Because the *de facto* officers, and not the nominal owner of UPT, controlled UPT, the acquittal of the nominal owner does not conflict with the convictions of UPT for the crimes

-2-

charged. UPT waived review of the issue concerning business records. The trial court should have considered the value of the services UPT provided in determining the amount of restitution UPT owed to the State. Therefore, we affirm UPT's convictions, vacate the order for restitution, and remand for reassessment of restitution.

¶ 4                                                    BACKGROUND

¶ 5        Ilya Lubenskiy met Irit Gutman in 1993 when they worked for A.K. Medical Transportation Company (A.K.). In 1995, Lubenskiy and Gutman opened Egra Medical Transportation, which provided transportation for public aid recipients who needed help to get to their medical appointments. Recipients called the public aid office to ask for transportation, and if the recipient had an up-to-date medical record and doctor's approval, the public aid office would schedule the transportation with a medical transportation company, like UPT. The public aid office would then complete a prior approval form. The prior approval form consisted of two copies–a white copy and a yellow copy. The public aid office kept the white copy for its records and the medical transportation provider received the yellow copy.

¶ 6        The form included a number used to indicate the category of service the medical transportation company provided to the public aid recipient. Providing transportation to a wheelchair-bound recipient had a different code from providing transportation to an ambulatory recipient. The code for the wheelchair-bound recipient triggered a higher level of compensation to the transportation provider. The form also included space for the transportation provider to indicate the distance of the trip. The medical transportation company received greater compensation for longer trips.

¶ 7        In 1999, the public aid office sent Egra a prior approval form with an incorrect code. The code indicated that the recipient could walk, but UPT actually had to transport the recipient in a wheelchair. Gutman protested the use of the wrong code. The person from the public aid office instructed Gutman to delete the incorrect code and insert the correct code. Gutman and Lubenskiy, for Egra, began to make similar changes on other prior approval forms, and Egra ordered blank prior approval forms. In order to increase payments to Egra, Gutman and Lubenskiy altered destinations, changed the categories of service, and increased the number of miles traveled as shown on the forms. Egra billed the public aid office for the work shown on the forms, with false information about destinations and categories of service. The public aid office paid some of the bills before discovering the fraud.

¶ 8        In December 1999, Lubenskiy and Gutman agreed to a permanent ban preventing them from participating in the Medicare program, all other federal healthcare programs, and the Illinois Medical Assistance Program. Under the terms of the agreement, Lubenskiy and Gutman could not directly or indirectly own 5% or more of a corporate vendor or provider, they could not order goods or services from a provider, and they could not render goods or services as an employee of a vendor.

¶ 9        Rather than sell Egra's assets, Lubenskiy and Gutman decided to defy the ban by trying to continue to operate Egra covertly. They chose to rename the company and find a third

partner to pose as the sole owner of the newly named company. In December 2000, Lubenskiy and Gutman agreed to give Mike Tishel one-third of the company and a salary, and Tishel agreed to pose as the sole owner of the company. Lubenskiy, Gutman and Tishel named the new company UPT.

¶ 10　　UPT began doing business on January 16, 2001. Except for the name change, the business remained the same: it had the same vehicles, the same drivers, the same employees and the same office space as Egra. From January 16, 2001, until February 2002, UPT billed the State of Illinois approximately $6 million and the State paid UPT almost $3 million. In February 2002, Lubenskiy and Gutman sold the business to Arik Amzaleg and Tishel for $600,000.

¶ 11　　On January 20, 2004, prosecutors charged UPT, Gutman, Tishel and Lubenskiy with vendor fraud, theft, and money laundering. On November 3, 2004, Lubenskiy entered into a plea agreement with the State, agreeing to plead guilty to vendor fraud and to testify against Gutman, Tishel, and UPT in exchange for dismissal of charges of theft and money laundering and a reduced sentence for vendor fraud. On April 25, 2005, Gutman filed a motion for severance, and the trial court granted the motion and held simultaneous bench trials that involved Gutman, Tishel, and UPT.

¶ 12　　　　　　　　　　　　　　　　The State's Case

¶ 13　　Lubenskiy testified that he kept UPT's books, and Gutman managed the business and talked with the public aid office on UPT's behalf, using an alias. UPT, like Egra, submitted false bills to the State. Lubenskiy admitted that on prior approval forms he sent to the State on UPT's behalf, he changed service categories, changed trip destinations, overstated mileages and increased the number of trips billed, all to make services more expensive.

¶ 14　　On cross-examination, Lubenskiy testified that Tishel did not know about the false billings. Specifically, Lubenskiy explained that Tishel ran a legitimate business out of the UPT office location while Lubenskiy ran a second business from a second office. Lubenskiy could not guess what percentage of the bills sent to the State accurately reflected services UPT provided.

¶ 15　　Alla Denisenkio, an employee of UPT, testified that she took orders for transportation services and relayed the orders to other employees, who helped provide the requested services. Denisenkio swore that she never created false billings.

¶ 16　　Robert Kramer, of the Department, testified that the public aid office could not locate all of UPT's prior approval forms. Kramer presented in court a box that contained some of UPT's prior approval forms that the public aid office retained. Kramer testified that the Department kept the contents of the box in the regular course of business.

¶ 17　　An investigator for the Illinois State Police found that on many of its prior approval forms, UPT overstated the mileage between the service recipients' homes and their destinations for medical services. The investigator testified that he compiled the information into an investigative report and gave the report to Virma Rodriguez, an auditor for the Illinois State Police and the Department.

¶ 18    Rodriguez testified that she and the Department's data control manager compared the prior approval forms Kramer found with the bills UPT submitted to the Department from January 2001 to February 2002. If the recipient's name, identification number or service date from the Department's copy of the prior approval form did not match the information from UPT's bill, Rodriguez considered the billing false. Rodriguez testified that of the $71,280.40 UPT billed the State of Illinois on the forms she reviewed, $67,798.18 came from false billings.

¶ 19    Rodriguez also compared mileages claimed on some of UPT's bills with proper mileages for the requested transportation to and from certain addresses from January 2001 until February 2002. Rodriguez found that the State paid UPT $235,106.01 for trips that should have cost the State $67,769.70.

¶ 20    Arik Amzaleg, who bought a 50% interest in UPT on February 27, 2002, estimated that UPT's legitimate billings averaged about $70,000 or $100,000 per month.

¶ 21    The Department's data control manager testified that from January 1, 2001, until February 28, 2002, the State paid UPT $2,966,187.38.

¶ 22    The trial court read Tishel's bond hearing testimony into the record. When asked at the bond rehearing if he was the owner of UPT, Tishel responded, "I was the only one on paper. God what they did to me." Tishel said Gutman effectively owned the business.

¶ 23                                    UPT's Case

¶ 24    Meir Rothstein testified that he was a real estate agent and brokered businesses. Rothstein went to UPT on a daily basis and saw Tishel run the business. During this time, he never saw Lubenskiy at UPT. Lubenskiy was not involved in the negotiations for the purchase of UPT. Rothstein testified that he has known Tishel for approximately 22 years and that Tishel has a reputation for being a man of his word.

¶ 25    Moshe Tishel, codefendant Tishel's son, testified that he was responsible for maintaining the company vehicles when his father owned UPT. Moshe testified that there was no kickback scheme. Finally, Moshe testified that the only contact he had with Lubenskiy was when Lubenskiy leased a vehicle to UPT.

¶ 26                              Trial Court's Findings

¶ 27    On April 19, 2007, the trial court dismissed the charges against Tishel, but found UPT guilty of vendor fraud, theft and money laundering. The trial court found that UPT came into existence for one reason: to allow Lubenskiy and Gutman to continue in a business endeavor after the federal government barred them from engaging in that business. Lubenskiy and Gutman needed a front man for UPT, and Tishel "agreed to be the straw man for them knowing that they were barred from doing business." The trial court further found that Lubenskiy and Gutman prevailed upon Tishel to put the business in his name, but the State failed to prove that Tishel took part in the irregularities that took place at UPT.

¶ 28                                    Posttrial Motions

¶ 29    On May 16, 2007, UPT made a motion to vacate the findings of guilt. On June 11, 2007, UPT filed a supplemental motion for reconsideration or, in the alternative, a new trial. On June 12, 2007, at a hearing on the motions, the court reiterated its finding that Gutman and Lubenskiy acted as the *de facto* officers of UPT. The court added that treating Tishel as the sole officer would "stand everything on its head." On July 24, 2007, the court denied the posttrial motions and ordered UPT to pay restitution of $2,966,187.38, and fines of $200,000.

¶ 30    On August 21, 2007, UPT filed a motion to reconsider or modify the sentence. On October 23, 2007, the trial court denied UPT's motion to reconsider or modify its sentence, amended the sentence to include a one-year conditional discharge, and affirmed its June 24, 2007, order directing UPT to pay restitution of $2,966,187.38 and fines of $200,000. Finally, on November 20, 2007, UPT filed a notice of appeal.


¶ 31                                       ANALYSIS
¶ 32                               Sufficiency of the Evidence

¶ 33    UPT contends that the State failed to prove it guilty of vendor fraud, theft and money laundering beyond a reasonable doubt. A reviewing court, when reviewing the sufficiency of the evidence, must determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)' " *People v. Cardamone*, 232 Ill. 2d 504, 511 (2009) (quoting *People v. Bush*, 214 Ill. 2d 318, 326 (2005), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A reviewing court must also allow all reasonable inferences from the record in favor of the prosecution. *Cardamone*, 232 Ill. 2d at 511 (quoting *Bush*, 214 Ill. 2d at 326, citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) (citing *People v. Collins*, 214 Ill. 2d 206, 217 (2005)). The trier of fact must determine the witnesses' credibility, decide how much weight to give each witness's testimony, resolve conflicts in the evidence, and draw reasonable inferences from the testimony. *Sutherland*, 223 Ill. 2d at 242 (citing *People v. Milka*, 211 Ill. 2d 150, 178 (2004), and *People v. Evans*, 209 Ill. 2d 194, 211 (2004)). We will reverse a trier of fact's findings and credibility determinations only if they are against the manifest weight of the evidence. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009) (citing *People v. Slater*, 228 Ill. 2d 137, 149 (2008), and *In re Christopher K.*, 217 Ill. 2d 348, 373 (2005)).

¶ 34    UPT argues that we should reverse the convictions because the State's case against it depended on the inherently incredible testimony of Lubenskiy. However, the trier of fact knew of Lubenskiy's admitted participation in the illegal activities in this case, but the trier of fact found Lubenskiy credible. This court finds no adequate grounds for disturbing the trial court's assessment of Lubenskiy's credibility. See *Sutherland*, 223 Ill. 2d at 242 (citing *Collins*, 214 Ill. 2d at 217).

¶ 35    Next, UPT contends that the State failed to prove all of the elements needed to support a conviction of a corporation for the crimes charged. A corporation can act only through its agents. *People v. Bohne*, 312 Ill. App. 3d 705, 708 (2000). Section 5-4 of the Criminal Code of 1961 (Criminal Code) explains that the State may prosecute a corporation for the commission of an offense if: (1) a high managerial agent, (2) acting within the scope of his or her employment, and (3) in behalf of the corporation, (4) authorized, requested, commanded, or performed the offense. 720 ILCS 5/5-4(a)(2) (West 2000). Section 5-4(c)(2) of the Criminal Code defines a "high managerial agent" as "an officer of the corporation, or any other agent who has a position of comparable authority for the formulation of corporate policy or the supervision of subordinate employees in a managerial capacity." 720 ILCS 5/5-4(c)(2) (West 2000).

¶ 36    We take judicial notice of Gutman's convictions for vendor fraud, theft and money laundering, and of our supreme court's decision affirming those convictions on appeal. *Gutman*, 2011 IL 110338, ¶ 46. Also, Lubenskiy pled guilty to vendor fraud in connection with the inflated bills he submitted to the State of Illinois on behalf of UPT. If Gutman and Lubenskiy served as high managerial agents of UPT, and they acted within the scope of their employment and on behalf of UPT when they committed the crimes of vendor fraud, theft and money laundering, then the convictions of UPT for those crimes must also stand. See 720 ILCS 5/5-4(a)(2) (West 2000). UPT argues that the State failed to prove (1) that Gutman and Lubenskiy served as high managerial agents of UPT, (2) that Gutman and Lubenskiy acted within the scope of their employment with UPT, and (3) that Gutman and Lubenskiy acted on behalf of UPT when they committed their crimes.

¶ 37    The trial court found that Gutman and Lubenskiy served as *de facto* officers of UPT. We will not reverse the trial court's findings of fact unless the manifest weight of the evidence requires contrary findings. *Richardson*, 234 Ill. 2d at 251 (citing *Slater*, 228 Ill. 2d at 149, and *In re Christopher K.*, 217 Ill. 2d at 373). The evidence established that: (1) Gutman and Lubenskiy owned and operated Egra; (2) after accepting a ban from operating Egra and from participating in any medical transportation provider, Lubenskiy and Gutman offered Tishel part of the company and explained that they would run the company and Tishel would receive a salary; (3) except for the name change from Egra to UPT, the business remained the same, with the same vehicles, the same drivers, the same employees and officers performing the same duties in the same office space; and (4) Gutman continued to manage the business and to talk with the public aid office as a representative of UPT and Lubenskiy continued to perform the bookkeeping for UPT. We find that the evidence supports the trial court's conclusion that Gutman and Lubenskiy acted as the *de facto* officers of UPT, effectively controlling its operations, just as they served as the officers and owners of Egra. See *Richardson*, 234 Ill. 2d at 251 (citing *Slater*, 228 Ill. 2d at 149, and *In re Christopher K.*, 217 Ill. 2d at 373).

¶ 38    Next, we must determine whether the evidence supports the finding that Gutman and Lubenskiy were acting within the scope of their employment for UPT when Gutman committed the offenses of vendor fraud, theft and money laundering, and Lubenskiy committed the offense of vendor fraud. 720 ILCS 5/5-4(a)(2) (West 2000). An employee acts

within the scope of his or her employment when he (1) performs acts of the kind his employer hired him to perform, (2) intending, at least in part, to serve the employer, (3) while working within " 'authorized time and space limits.' " Restatement (Second) of Agency § 228(1)(b) (1958), *quoted in Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164 (2007). The evidence presented at trial established that: (1) Gutman and Lubenskiy formed UPT for the purpose of falsely billing the State of Illinois and obtaining excessive payments for UPT's services; (2) that Gutman managed the business and spoke for UPT with the public aid office and the recipients; (3) that Lubenskiy kept UPT's books and submitted bills to the State of Illinois in the name of UPT; and (4) that Gutman and Lubenskiy submitted bills to the State of Illinois on behalf of UPT for $6 million and UPT received $3 million, which exceeded the amount the State should have paid UPT for its services. The actions of Gutman and Lubenskiy accorded with the kinds of acts UPT meant for them to perform, and their acts served the purpose for which they created UPT. Therefore, we hold that the State presented sufficient evidence to establish that Gutman and Lubenskiy acted within the scope of their employment for UPT from January 16, 2001, until February 2002, when they committed vendor fraud, theft and money laundering. 720 ILCS 5/5-4(a)(2) (West 2000).

¶ 39        Next, we must determine whether the evidence supports the finding that Gutman and Lubenskiy also acted on behalf of UPT when Gutman committed the offenses of vendor fraud, theft and money laundering and Lubenskiy committed the offense of vendor fraud. 720 ILCS 5/5-4(a)(2) (West 2000). The evidence presented at trial established that Gutman and Lubenskiy billed the State of Illinois in UPT's name for approximately $6 million and UPT received $3 million, due to the acts of Gutman and Lubenskiy between January 16, 2001, and February 2002. Therefore, Gutman and Lubenskiy also acted in behalf of UPT, furthering its business interests, when they committed vendor fraud, theft and money laundering. See *Milton v. Illinois Bell Telephone Co.*, 101 Ill. App. 3d 75, 79-80 (1981). Thus, under section 5-4 of the Criminal Code, the State proved that UPT committed the offenses of vendor fraud, theft, and money laundering. 720 ILCS 5/5-4(a)(2) (West 2000).

¶ 40        In conclusion, because we have found that Gutman and Lubenskiy were high managerial agents of UPT, acting within the scope of their employment, and acting on behalf of the corporation when Gutman committed the offenses of vendor fraud, theft and money laundering and Lubenskiy committed the offense of vendor fraud, we hold that the trial court did not err when it found UPT guilty of the offenses of vendor fraud, theft and money laundering, the same offenses committed by its high managerial agents. 720 ILCS 5/5-4(a)(2) (West 2000); see also *Bohne*, 312 Ill. App. 3d at 708.


¶ 41                        Legally Inconsistent Verdicts

¶ 42        UPT argues that the trial court entered legally inconsistent verdicts when it found UPT guilty of vendor fraud and theft but acquitted Tishel of the same offenses. We disagree. UPT bases its argument on the assumption that only Tishel served as a high managerial agent of UPT, because UPT listed Tishel as its sole owner. However, the evidence supports the trial court's finding that UPT also acted through its *de facto* officers, Gutman and Lubenskiy.

¶ 43    UPT cites *People v. O'Neil*, 194 Ill. App. 3d 79 (1990), in support of its position. In *O'Neil*, the court found all of the three individual defendants guilty of the murder of a coworker, and the court found two corporate defendants guilty of the involuntary manslaughter of the same coworker. *O'Neil*, 194 Ill. App. 3d at 80-81. On appeal, the defendants argued that the judgments for murder and involuntary manslaughter conflicted because the offense of murder requires a knowing and intentional act while reckless conduct does not. *O'Neil*, 194 Ill. App. 3d at 84. The defendants further argued that both convictions arose from the same acts of the individual defendants. *O'Neil*, 194 Ill. App. 3d at 84. The *O'Neil* court held that the judgments rendered for the offenses were legally inconsistent because the court used the same conduct to support both findings of guilt, but the offenses had mutually exclusive mental states. *O'Neil*, 194 Ill. App. 3d at 96.

¶ 44    Here, the court convicted UPT and its high managerial agents of the same offenses. In this case, unlike *O'Neil*, the trial court attributed the same mental state to the corporation and its officers. *O'Neil* does not require reversal here. Therefore, we hold that the trial court did not enter legally inconsistent verdicts when it acquitted Tishel and convicted UPT of vendor fraud, theft and money laundering based on the actions of UPT's high managerial agents, Gutman and Lubenskiy.


¶ 45              Financial Records Admitted Under the Business Records Exception

¶ 46    Next, UPT contends that the trial court erred in admitting financial records under the business records exception because the prosecution laid an insufficient foundation for their admission and the State destroyed the bulk of the relevant underlying records.

¶ 47    Section 115-5(a) of the Code of Criminal Procedure of 1963, commonly referred to as the business records exception to the hearsay rule, provides that "[a]ny writing or record *** made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter." 725 ILCS 5/115-5(a) (West 2006). Section 115-5(c)(2) of the Code of Criminal Procedure of 1963 further provides that "[n]o writing or record made in the regular course of any business shall become admissible as evidence *** if *** [s]uch writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind." 725 ILCS 5/115-5(c)(2) (West 2006); see also *People v. McClanahan*, 191 Ill. 2d 127, 133 (2000). The trial court may admit into evidence summaries of voluminous documents where the underlying data upon which the proponent bases the summary satisfies the ordinary business exception, and the trier of fact cannot conveniently examine the contents of the voluminous writings in court. *People v. Wiesneske*, 234 Ill. App. 3d 29, 41 (1992).

¶ 48    The party seeking to admit a purported business record into evidence must lay an adequate foundation for the business record, including "a showing that the record was made as a memorandum or record of the act; the record was made in the regular course of business;

and that it was the regular course of the business to make such a record at the time of the act or within a reasonable time thereafter." *People v. Morrow*, 256 Ill. App. 3d 392, 397 (1993) (citing *People v. Tsombanidis*, 235 Ill. App. 3d 823, 835 (1992)). "In the case of computer-generated records, a proper foundation additionally requires a showing that: standard equipment was used; the particular computer generates accurate records when used appropriately; the computer was used appropriately; and the sources of the information, the method of recording utilized, and the time of preparation indicate that the record is trustworthy and should be admitted into evidence." *Morrow*, 256 Ill. App. 3d at 397 (citing *Riley v. Jones Brothers Construction Co.*, 198 Ill. App. 3d 822, 829 (1990), and Michael H. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 654-55 (5th ed. 1990)). Opposing counsel may object if the evidence presented fails to support introduction of the evidence being offered or lacks a sufficient foundation. See Michael H. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.18, at 546 (7th ed. 1999). "Like other evidentiary rulings, the determination of whether or not business records are admissible is within the sound discretion of the trial judge, and such determinations will not be reversed absent an abuse of discretion." *Morrow*, 256 Ill. App. 3d at 396 (citing *Tsombanidis*, 235 Ill. App. 3d at 833, and *People v. Boclair*, 129 Ill. 2d 458, 476-77 (1989)).

¶ 49　　In support of its claim that it preserved this issue for review, UPT refers to the pages in the record where it generally objected to the admission of unspecified exhibits in the record. But apart from that reference, UPT (1) fails to cite to the pages in the record where the State introduced the exhibits UPT now seeks to challenge; (2) fails to cite to the pages in the record where witnesses identified and discussed the exhibits; (3) fails to cite to the pages in the record where witnesses allegedly testified that they prepared the exhibits solely for litigation purposes; and (4) fails to cite to the pages in the record where UPT allegedly objected to the admission of the exhibits on the basis of an improper foundation. Because UPT failed to cite to the pages in the record where the witnesses discussed the exhibits and where UPT made its objections, this court cannot determine whether the State laid a proper foundation for the exhibits. We cannot determine: (1) whether the exhibits qualify as business records, made as memoranda or records of transactions; (2) whether the exhibits qualify as business records made in the regular course of business; and (3) whether the exhibits qualify as business records created in the regular course of the business at the time of the acts recorded or within a reasonable time thereafter. See *Morrow*, 256 Ill. App. 3d at 397 (citing *Tsombanidis*, 235 Ill. App. 3d at 835). Similarly, because UPT failed to cite to the pages in the record where the witnesses discussed the exhibits, this court cannot determine whether the State laid proper foundations for the computer records. We cannot determine: (1) whether the Department used standard computer equipment; (2) whether the computer generated accurate records when used appropriately; and (3) whether the Department used the computer appropriately. Therefore, we cannot tell whether the trial court should have found the records trustworthy and admissible. See *Morrow*, 256 Ill. App. 3d at 397 (citing *Riley*, 198 Ill. App. 3d at 829).

¶ 50　　Supreme Court Rule 341(h)(7) provides that the appellant's brief shall include an argument containing the appellant's contentions, the reasons therefor, citation of the

authorities, and the pages of the record on which the appellant relies. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Supreme Court Rule 341(h)(7) further provides that parties waive any points not argued. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). We find that, by failing to cite to the pages in the record relied upon in support of the contentions in its brief as required by Rule 341(h)(7), UPT forfeited its argument that the trial court erred when it admitted various exhibits pursuant to the business records exception. Ill. S. Ct. R. 341(h)(6), (h)(7) (eff. July 1, 2008). "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation]." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Also, we must presume that the trial court judge would not have admitted the exhibits if the State had not laid proper foundations for them, because "[w]e ordinarily presume that the trial judge knows and follows the law unless the record indicates otherwise." *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996) (citing *People v. Terrell*, 132 Ill. 2d 178, 219 (1989)). Accordingly, we hold that UPT has not shown that the trial court abused its discretion when it admitted the exhibits that the defendant complains about in this appeal.

¶ 51                                                            Restitution

¶ 52        Finally, UPT contends that the trial court erred in ordering it to pay $2,966,187.38 in restitution. Specifically, UPT contends that the trial court erred when it failed to require the State to prove the actual amount of loss and failed to reduce the restitution by the value of the legitimate services UPT provided. We review the trial court's restitution order for abuse of discretion. *People v. Stites*, 344 Ill. App. 3d 1123 (2003).

¶ 53        Section 5-5-6 of the Unified Code of Corrections provides:

"If the court determines that an order directing the offender to make restitution is appropriate, the offender may be sentenced to make restitution. *** If the offender is sentenced to make restitution the Court shall determine the restitution as hereinafter set forth:

(a) At the sentence hearing, the court shall determine *** whether the defendant should be required to make restitution in cash, for out-of-pocket expenses, damages, losses, or injuries found to have been proximately caused by the conduct of the defendant ***.

(b) In fixing the amount of restitution to be paid in cash, the court shall allow credit for property returned in kind, for property damages ordered to be repaired by the defendant, and for property ordered to be restored by the defendant; and after granting the credit, the court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and any other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant ***." 730 ILCS 5/5-5-6 (West 2000).

¶ 54    The State candidly admits that it has found no case in which the court interpreted this section of the Code in a similar context. UPT compares this case to *People v. Jones*, 145 Ill. App. 3d 835 (1986), in which the trial court ordered the defendant to pay restitution for criminal damage to a car, without considering the scrap value of the car the defendant damaged. The appellate court reversed for the trial court to reduce the amount of restitution by the value of the scrap. We agree with the State that the fact that UPT, as a front for Gutman and Lubenskiy, could not legally receive any compensation from the State for medical transport services makes this case distinguishable from *Jones*. Like the parties, we found no useful legislative history for section 5-5-6.

¶ 55    We seek guidance from cases from other jurisdictions, and especially from federal cases interpreting the Mandatory Victims Restitution Act of 1996 (18 U.S.C. § 3663(a) (2006)). In *United States v. Maurello*, 76 F.3d 1304 (3d Cir. 1996), the defendant provided legal services to several persons despite his lack of an attorney's license. The court held that the defendant did not need to pay restitution of the legal fees he received from persons he served satisfactorily. *Maurello*, 76 F.3d at 1311-12. Other courts followed *Maurello* and formulated the general rule that courts ordering restitution from one who fraudulently offers professional services should allow a credit against the restitution for the value of the services the unlicensed person performed. See *Van Zanen v. Qwest Wireless, L.L.C.*, 522 F.3d 1127, 1131 (10th Cir. 2008).

¶ 56    The United States Court of Appeals for the Seventh Circuit applied the principle espoused in *Maurello* to *United States v. Vivit*, 214 F.3d 908 (7th Cir. 2000), a case in which a medical service provider fraudulently overbilled the government for services. The *Vivit* court held:

> " '[I]n calculating loss, the district court should give credit for any legitimate services rendered to the victims.' [*United States v. Sayakhom*, 186 F.3d 928, 946 (9th Cir. 1999)].
>
> *** [I]n frauds where the item misrepresented has some value, the value of this item should be netted against the price offered to determine the amount of loss. While we have traditionally applied this netting theory in the fraudulent sale of goods, [citation], we have also applied this theory to the fraudulent misrepresentation of other items of value, when some value has actually been transferred. [Citation.] Despite the government's contention that the overwhelming majority of Vivit's billing was based on unperformed or unnecessary services, the evidence presented demonstrates that Vivit did perform some legitimate medical services. For this reason, we calculate the amount of loss suffered by the insurers by netting the total costs submitted by Vivit, minus the legitimate medical services that he provided." *Vivit*, 214 F.3d at 915.

¶ 57    The amount of harm resulting from a defendant's fraud affects both the length of the defendant's sentence and the amount of restitution ordered. In response to *Maurello*, the United States Sentencing Commission added a note to the sentencing guidelines to state:

> "In a case involving a scheme in which *** services were fraudulently rendered to the victim by persons falsely posing as licensed professionals *** loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented,

with no credit provided for the value of those items or services." United States Sentencing Guidelines Manual § 2B1.1, Commentary, Application Note 3(F)(v) (Nov. 1, 2011).

Section 2B1.1 applies only to the calculation of loss for purposes of determining the length of a defendant's sentence. The Sentencing Commission added no similar comment to the guidelines on restitution. United States Sentencing Guidelines Manual § 5E1.1 (Nov. 1, 2001); see *United States v. Allen*, 529 F.3d 390, 396 (7th Cir. 2008). Since the Sentencing Commission added the note about loss calculation for sentencing purposes, most federal courts have continued to offset the value of any services performed against the payments illegally received for purposes of calculating restitution. See *Allen*, 529 F.3d at 396-97; *United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011); but see *United States v. Hunter*, 618 F.3d 1062, 1064-66 (9th Cir. 2010). Finally, we note the court held in *United States v. Dokich*, 614 F.3d 314, 320 (7th Cir. 2010), "in the context of restitution awards, the government's evidence of actual loss must deduct any financial benefit realized by victims of the fraud."

¶ 58    We found only one federal case since the change in the sentencing guidelines that disallowed an offset against the loss for services performed. In *Hunter*, Northstar Borough hired Hunter to work as a nurse after she mailed to Northstar false documents reflecting fictitious nursing credentials. The trial court ordered her to pay in restitution all of the wages Northstar and the Department of Labor paid her, without any deduction for the services Hunter actually performed. The Ninth Circuit affirmed, holding:

"Both Northstar Borough and the Department of Labor were directly and proximately harmed by Hunter's mail fraud because they paid for the services of a licensed nurse that were never received. ***

    *** Northstar and the Department of Labor paid for nursing services that Hunter was not qualified to perform, and so did not get what they paid for." *Hunter*, 618 F.3d at 1064-65.

¶ 59    Here, the State paid UPT for transporting public aid recipients in need of assistance to their medical service providers. The testimony of the State's witnesses shows that UPT provided the necessary services the State sought for a number of persons in need of medical services. Lubenskiy, Tishel and Denisenkio all testified that Tishel ran UPT as a legitimate business, providing transportation services to public aid recipients. In accord with *Allen*, *Dokich*, and *Vivit*, we find that in calculating the amount of restitution, the trial court should have allowed UPT a credit for the legitimate services it provided to the State.

¶ 60    For the burden of proof, we adopt the reasoning of the court in *United States v. Sheinbaum*, 136 F.3d 443, 448 (5th Cir. 1998), where the court said:

"Logically, the burden of proving an offset should lie with the defendant. The statute allocates the various burdens of proof among the parties who are best able to satisfy those burdens and who have the strongest incentive to litigate the particular issues involved. *** [T]he defendant should know the value of any compensation he has already provided to the victim in civil proceedings, so the burden should fall on him to argue for a

reduction in his restitution order by that amount."

See also *United States v. Elson*, 577 F.3d 713, 734 (6th Cir. 2009); *Bryant*, 655 F.3d at 254. We suggest that *United States v. Austin*, 54 F.3d 394, 402 (7th Cir. 1995), which permits the use of sampling to estimate the total loss a defendant caused, may provide some useful guidance for determining the proper amount of restitution.

¶ 61                                                   CONCLUSION

¶ 62          The State proved that UPT's *de facto* officers, Lubenskiy and Gutman, committed vendor fraud, theft and money laundering in the course of their work on behalf of UPT, and therefore the evidence supports the convictions of UPT for those three crimes. The convictions of UPT on the basis of the acts of its *de facto* officers does not conflict with the acquittal of UPT's nominal owner for the same charges. UPT failed to show that the trial court abused its discretion when it admitted certain exhibits into evidence as business records. The trial court should have considered the value of the services UPT rendered when it ordered UPT to pay restitution. Accordingly, we affirm the convictions, reverse the restitution order and remand for further proceedings to establish an appropriate amount of restitution.

¶ 63          Affirmed in part and reversed in part; cause remanded.